**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **SMARTPHONE TECHNOLOGIES LLC,** | § § § | **NO. 6:12cv245 LED-JDL** |
| **v.** | § § | |
| **HUAWEI DEVICES USA, INC., et al.** | § | |

| | | |
|---|---|---|
| **SMARTPHONE TECHNOLOGIES LLC,** | § § § | **NO. 6:12cv350 LED-JDL** |
| **v.** | § § | |
| **ZTE CORPORATION, et al.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This claim construction opinion construes the disputed claim terms in U.S. Patent Nos. RE40,459 ("the '459 patent"); 7,076,275 ("the '275 patent"); and 7,506,064 ("the '064 patent"). Plaintiff SmartPhone Technologies LLC ("SmartPhone") alleges Defendants Huawei Device USA Inc., Futurewei Technologies, Inc., ZTE Corporation, ZTE (USA), Inc., and ZTE Solutions, Inc. (collectively, "Defendants") infringe the patents-in-suit. The parties have presented their claim construction positions (No. 6:12cv245, Doc. Nos. 162, 163 & 167; No. 6:12cv350, Doc. Nos. 67, 73 & 75).[1] On July 11, 2013, the Court held a claim construction hearing. For the reasons stated herein, the Court adopts the constructions set forth below.[2]

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381

---

[1] The briefing for the two actions is identical.
[2] The Court has previously construed these patents. *See SmartPhone Technologies, LLC v. Research in Motion Corp.*, No. 6:10cv74, 2012 WL 3150756 (E.D. Tex. Aug. 2, 2012).

F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp.v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v.Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at 1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337,

1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir.

2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'")
(citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an
applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d
1372, 1378-79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim
interpretation, prosecution disclaimer promotes the public notice function of the intrinsic
evidence and protects the public's reliance on definitive statements made during prosecution."
*Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative
meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on
the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and
treatises may help the Court understand the underlying technology and the manner in which one
skilled in the art might use claim terms, but such sources may also provide overly broad
definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly,
expert testimony may aid the Court in determining the particular meaning of a term in the
pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim
term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its
prosecution history in determining how to read claim terms." *Id.*

## DISCUSSION

### I.      The '459 Patent

The '459 patent is a reissue of U.S. Patent No. 6,343,318 and is directed toward a
"system and method for handheld device[s] to access Internet information over relative low
bandwidth networks." '459 patent at 3:28-30. In order to reduce the amount of data transmitted
over the network, the handheld device has pre-loaded forms that "contain all of the field names

and selection values in them." *Id.* at 113:54-57. Alternatively, the handheld device uses server dependent forms that "do[] not contain the field names or selection values for each field in the form." *Id.* at 113:24-25. When transmitting a server dependent form, "the wireless client 405 transmits only the index of each field in the form and its user input value . . . to the proxy server." *Id.* at 113:35-39. The proxy server then retrieves the actual field names and values from an original HTML form and then sends the request to the web server. *Id.* at 113:39-45.

SmartPhone asserts Defendants infringe Claims 1, 17 and 18 of the '459 patent. Claim 1 is set forth below as representative of the disputed claim terms (set forth in bold):

> 1. A handheld computer comprising:
>> a display;
>> an antenna;
>> **a memory configured to store a set of data** configured for
> a selected network site; and
>> a processor configured to:
>>> access the set of data from the memory to render a
>> **form for the selected network site**, the form including one or
>> more fields;
>>> associate user-input to the one or more fields
>> provided by the form;
>>> signal a **wireless communication** over the antenna
>> for the selected network site, the wireless communication
>> comprising the form with the user-input being associated with the
>> one or more fields,
>>> receive a response over the antenna, the response
>> originating from the selected network site; and
>>> providing a content comprising one or more
>> selectable pages appearing on the display, a first portion of the
>> content being derived from the set of data for the selected network,
>> a second portion of the content being derived from the response
>> received over the antenna from the selected network site.

'459 patent at 151:18-41 (Claim 1).

### a. "wireless communication"[3]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction | a radio transmission of information that is |

---

[3] This term is contained in Claims 1 and 17.

| necessary. | suitable for low-bandwidth networks |

The primary issue permeating the parties' dispute is whether the wireless communication must be capable of communicating over a low-bandwidth network. Defendants contend that the invention must be so limited because the specification describes the invention accordingly. RESPONSE AT 12. In particular, the disclosures states that "the invention relates to low bandwidth network access to Internet based information." *Id.* (citing '459 patent at 1:42-43). Moreover, Defendants maintain that the specification notes that all embodiments of the invention must be capable of transmitting information over low-bandwidth networks. *Id.* at 12-13 (citing '459 patent at 9:12-14).

In contrast, SmartPhone argues that the claim language sufficiently describes the wireless communication, and therefore no construction is necessary. PLTFF'S BRIEF AT 6. As for Defendants' proposal, SmartPhone asserts that the specification should not limit the plain language of the claims; SmartPhone attests that the language of Claim 1 of the '459 patent does not limit embodiments to a low-bandwidth network. *Id.* at 7-8.

SmartPhone is correct. "The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115). While the claims must be read in light of the specification, the disclosures within the specification do not overcome the "bedrock principle" that the claims, not the written description, define the invention. *Id.* at 1312, 1315, 1327 (holding that a baffle may be at a right angle despite no such disclosure in the specification). Looking at the relevant portion of Claim 1 of the '459 patent, the claim language does not restrict wireless communications to any particular form, low-bandwidth or otherwise:

> signal a wireless communication over the antenna for the
> selected network site, the wireless communication comprising the

> form with the user-input being associated with the one or more
> fields . . . .

'459 patent at 151:30-33. The claim language requires that the wireless communication occur over an antenna, and further, that the communication comprise the form with the field-associated user input. No other limitations are recited. While Defendants are correct that a number of embodiments within the disclosure describe the capability of wirelessly transmitting over a low-bandwidth network, the claim language is not so restrictive. *See Arlington Industries, Inc. v. Bridge Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.") (internal citations omitted); *Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

In addition, the patentee expressed caution against limiting the disclosed invention to the embodiments described in the specification: "Although many details have been included in the description and the figures, the invention is defined by the scope of the claims. Only limitations found in those claims apply to the invention." '459 patent at 4:15-18. Thus, the Court declines to limit all wireless communications to be capable of transmission over a low-bandwidth network.

The claim language provides sufficient context for "wireless communication." Moreover, the Court has resolved the parties' claim scope dispute. Accordingly, no construction is necessary for the term "wireless communication." *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

### b. "a form for the selected network site"[4]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | an electronic page that allows users to fill in and submit information to a selected network site; the electronic pages are either (1) stand-alone (preloaded on the handheld device, containing all of the field names and selection values) or (2) server-dependent (do not contain the field names or selection values for each field such that the handheld device sends only the index of each field and its user input value to a proxy server) |

The parties' dispute regarding "a form for the selected network site" is twofold: (1) whether the form is an electronic page and (2) whether the form must be one of two types—standalone or server dependent. Defendants contend that the specification states that the form is an electronic page, and further, that the specification discloses only the use of stand-alone and server-dependent forms. RESPONSE AT 6, 9 (citing '459 patent at 9:48-52). According to Defendants, no other types of forms are disclosed. *Id.* at 6. Further, Defendants argue that their proposed construction reflects the Court's reasoning in the previous claim construction ruling; the Court has already stated that the '459 patent disclosure describes the use of both stand-alone and server-dependent forms. *Id.* at 7.

SmartPhone however, disagrees with Defendants, arguing that the claim language provides sufficient definition for the term in dispute. *See* PLTFF'S BRIEF AT 10. According to SmartPhone, the language of Claim 1 is broad enough to encompass both the stand-alone and server-dependent forms, but does not necessarily limit the form to such embodiments. *Id.*

#### *1. Electronic Page*

As stated above, Defendants contend that the form is an electronic page. Yet, the claim language does not reflect such a limitation. In fact, Claim 1 recites both a "form" and a "page,"

_____
[4] This term is contained in Claim 1.

indicating that a form is different from a page. *See Digital-Vending Services Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.") (internal citations omitted); *Innova/Pure Water, Inc.*, 381 F.3d at 1119 ("[A]ll claim terms are presumed to having meaning in a claim."). Because different claim terms are presumed to mean different things, it would be inappropriate to define a form as a page; to do so would render the term "form" superfluous. Accordingly, the Court declines to limit a form to an electronic page.[5]

### 2. Form Types

The Court adopts SmartPhone's proposed construction. While the specification accounts for both standalone forms and server dependent forms, '459 patent at cols. 47-50,[6] the language of Claim 1 does not explicitly identify particular types of forms to be used. Claim 1 recites, in relevant part:

> 1. A handheld computer comprising:
>   . . .
>    a processor configured to:
>      access the set of data from the memory to render a form for the selected network site, the form including one or more fields;
>      associate user-input to the one or more fields provided by the form;
>      signal wireless communication over the antenna for the selected network site, the wireless communication comprising the form with the user-input being associated with the one or more fields . . . .

'459 patent at 151:18-40. The claim language does not limit the form type to a stand-alone or server-dependent form, as Defendants contend. Rather, Claim 1 generically discloses that a form

---

[5] In its prior construction, the Court rejected a similar proposal to limit a form to a page. *See SmartPhone Technologies, LLC v. Research in Motion Corp.*, No. 6:10cv74, 2012 WL 3150756, at *3-*5 (E.D. Tex. Aug. 2, 2012).
[6] "There are essentially 2 classes of forms for the wireless communications device 100 as described in the Forms Processing section below: standalone forms (like in standard HTML) and server dependent forms."

has one or more fields. Because the claim language dictates the legal bounds of the invention, Defendants' proposal is rejected.

Having resolved the parties' claim scope dispute and finding that the claim language provides sufficient information regarding "a form for the selected network site," the Court finds that the term requires no construction.

### c. "a memory configured to store a set of data" / "the set of data from the memory"[7]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a memory configured to store static electronic data / the static electronic data from the memory | a memory configured to store static electronic page data / the static electronic page data from the memory |

The central claim scope dispute is whether the stored data is electronic *page* data. RESPONSE AT 9. Defendants contend the stored data is electronic page data, whereas SmartPhone asserts that the stored data is data of any type. *Id.* at 10. The parties do, however, agree that the data is static data stored in memory. *Id.* at 9.

SmartPhone maintains that the claim language states a relationship between pages and data, and therefore the recited "set of data" cannot be "page data." PLTFF'S BRIEF AT 12. SmartPhone points to the specification as further support. *Id.* (citing '459 patent at 6:28-34).

Claim 1 provides a description of the relationship between "selectable pages" and the "set of data":

> providing a content comprising one or more selectable pages appearing on the display, a first portion of the content being derived from the set of data for the selected network, a second portion of the content being derived from the response received over the antenna from the selected network site.

---

[7] These terms are contained in Claims 1 and 17.

'459 patent at 151:36-41.  The excerpt cited above states that a portion of the content that makes up the selectable pages is generated, in part, from the set of data stored in memory.  Thus, the claim language adequately provides context for "the set of data."

Moreover, the remainder of the claim language further indicates that the data is not necessarily page data.  The claim recites, in part:

> a processor configured to:
> access the set of data from the memory to render a form for the selected network site, the form including one or more fields . . . .

'459 patent at 151:24-27.  The claim language above states that the set of data is used to render a form.  As stated above, the Court has rejected the notion that the form is an electronic page.  *See* SECTION I.b. *supra*.  Therefore, the data need not be limited to electronic page data.

A reading of the specification and prosecution history does not contradict the claim language.  Defendants contend that because Claim 1 recites that the "set of data" is "configured for a selected network site," the data must be web page-related.  RESPONSE AT 10.  The specification notes that "the selected network site" recited in Claim 1 is not limited to a website or web page, as Defendants appear to contend.  According to the specification, the network is not limited to the Internet or a website because "the Internet 190 could be replaced by any communications network."  '459 patent at 11:6-8.  Thus, a "selected network site" need not be a webpage.  Therefore, the data that composes the content for the selected network pages is not necessarily limited to electronic page data.

During prosecution, the patentee made some comments alluding to the data/page relationship, each comment reflecting that pages are made up, in part, of content derived from the set of data in memory:

- Some of the page appearing as content to the user is using data stored for the selected network site. This stored data is static, and does not need to be retrieved.

- The content may be in the form of multiple linked pages. Some of the content is the result of data provided in a response from the selected network site. However, some of the content is also the result of data stored on the device.

RESPONSE AT 8-9, U.S. PATENT APPL. SER. NO. 09/087,515 (MAY 29, 1998), EX. E, ATTACHED TO PLTFF'S BRIEF. Defendants argue that these comments indicate that the set of data is web page content displayed to the user. RESPONSE AT 11. However, these statements simply reflect the language of Claim 1, further supporting the idea that the content that comprises the selected pages consists, in part, of the data stored in memory. These statements do not indicate the patentee intended to limit the data set to electronic page data.

As stated above, the parties agree that the data is static electronic data. Therefore, the Court finds that "a memory configured to store a set of data" and "the set of data from the memory" mean "a memory configured to store static electronic data," and "the static electronic data from the memory," respectively.

## II. The '275 Patent

The '275 patent claims "[a] method and apparatus for automatic delivery of a phone call on a device (e.g. a portable computer system) regardless of whether other tasks are running on the operating system." '275 patent, ABSTRACT. A background task, always active, responds to an incoming call even "if the user is in a graphical user interface window that requires some input from the user." *Id.*

### a. "a background task executed by said processor"[8]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a background task of said operating system of | a task of said operating system of said device |

---

[8] This term is contained in Claim 1.

| said device executed by said processor | executed by said processor without any user interaction |
| --- | --- |

The central dispute among the parties is whether the background task is executed without any user interaction. *See* Response at 15-16. Defendants maintain that the background task involves no user interaction, as stated in the claims, specification, and technical dictionaries. *Id.* at 16-17. In contrast, SmartPhone contends that the Court should adopt its previous construction. Pltff's Brief at 13. However, Defendants note that the Court was presented with a different claim scope dispute when it rendered its previous construction. Response at 16. Therefore, Defendants argue their proposal should be adopted.

While the Court has defined "a background task executed by said processor" as "a background task of said operating system of said device executed by said processor," Defendants are correct that a different dispute was previously before the Court. At the time, the Court was confronted with the issue of "whether the background task executed by the processor is a part of, or separate from, the operating system." *SmartPhone Technologies, LLC v. Research in Motion Corp.*, No. 6:10cv74, 2012 WL 3150756, at * 8 (E.D. Tex. Aug. 2, 2012). Defendants do not dispute that the background task is a part of the operating system and executed by the processor. Response at 16. The Court is now presented with a different issue, whether the background task is executed without user interaction.

SmartPhone's proposal does not address whether the background task is executed without any user interaction. Defendants' proposal, however, is supported by the claim language, the specification, and technical dictionary definitions. Claim 1 recites, in relevant part, "notifying a user of said device of said incoming phone call by said background task *irrespective of the user's activity on said device without terminating said application*." '275 patent at 8:32-35 (emphasis added). The claim language indicates that regardless of the user's activity, the background task

alerts the user of an incoming phone call.  Thus, the background task performs without any user interaction.

In addition, the specification discloses that the telephony function, enabled by the background task, operates without any user interaction:

> In summary, in accordance with the present invention, when a device (e.g., a portable device such as portable computer system 100) with telephony functionality receives a phone call, the call can be answered by the user, regardless of whether other tasks are running on the operating system.  A separate background task, *independent of the user interface task, enables telephony functionality without requiring use of the graphical user interface*.  The background task monitors an interrupt line and controls the serial port connected to the phone chipset.
>
> In accordance with the present embodiment of the present invention, telephony functionality is enabled in all situations, even where the graphical user interface is blocked.  In addition, *telephony functionality can be automatically implemented in the background without a user knowing it is occurring*, and thus is convenient and user-friendly.

'275 patent at 7:42-57 (emphasis added); *see also id.* at 2:32-36 ("The background task responds to an incoming call even if the user is in a graphical user interface window that requires some input from the user (e.g. the user interface is blocked), and the task alerts the user of the incoming phone call.").  The specification notes that the background task executes, e.g., notifies the user of a call, without user interaction.

Moreover, the technical definitions of background task comport with the claim language and specification.  The *Penguin Dictionary of Computing* (2001) defines a "background task" as "[a] software process that continues to run without any user interaction or visible interface while other programs are being run on the same computer."   Ex. 6, ATTACHED TO RESPONSE.

Accordingly, "a background task executed by said processor" is "a task of said operating system of said device executed by said processor without any user interaction."

### b. "always active"[9]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| active when said telephony functionality is enabled | Plain and ordinary meaning. No construction necessary. |

The parties dispute whether the background task is "always active," even when the telephony functionality is disabled. SmartPhone contends the Court's prior construction is correct—"always active" means "active when said telephony functionality is enabled." *See* PLTFF'S BRIEF AT 15. Defendants, however, argue that "always active" should be construed in accordance with its plain and ordinary meaning. RESPONSE AT 18. In addition, Defendants contend the prior construction adds a limitation to the claim. *Id.* at 19.

Defendants are correct. Requiring that the background task be active only when the telephony functionality is enabled adds an unnecessary limitation to the claim. Claim 1 recites, in part:

> monitoring for incoming phone calls by a background task of said operating system of said device, said background task interfacing directly with the telephony functionality of said device, said background task always active, said operating system including at least one application. . . .

'275 patent at 8:22-27. The relevant portion of the claim states that the background task is always active, or always monitoring for incoming phone calls. The claim language does not qualify or condition "always active" by stating that the background task is only active when the telephony functionality is enabled.

Moreover, the background task is not affected by whether the telephony functionality is on or off:[10]

---

[9] This term is contained in Claim 1.

[10] Much of the Court's prior construction of "always active" was premised on the possibility that the device was turned off. In other words, the Court construed "always active" as "active when said telephony functionality is enabled" because the parties presented argument at the claim construction hearing that the device cannot receive

FIG. 4a [right] is a block diagram 400, in accordance with one embodiment of the present invention, illustrating a device (e.g. a palmtop or portable computer system) having *a separate background task that interfaces directly with the telephony functionality* (e.g. a cellular phone) of the device. In one embodiment of the present invention, the device 405 contains at least two chipsets, an operating system chipset 410 and a phone chipset 425. Operating system chipset 410 operates to control a wide variety of



applications of the device including the graphical user interface 415 and the telephony task 420.

In one embodiment of the present invention, phone chipset 425 receives incoming phone calls. The telephony task 420 monitors the phone chipset 425 for incoming calls. . . .

FIG. 4b [right] is a software block diagram 450 showing a portable computer system with *a separate task to handle telephony functions* in accordance with one embodiment of the present invention. The background task 455 responds to the interrupt line 460, wherein the interrupt line 460 monitors for incoming phone calls. The background task 455 is also connected to the telephony chipset 465 through serial port 470. The



background task 455 senses the system buttons and graphical user interface of the portable computer system, and controls any LED, ringer or vibrator 480.

'275 patent at 5:60-6:3; 6:20-30 (emphasis added); FIGS. 4a-b. The telephony functionality for receiving an incoming phone call is dependent on phone chipset 425, which is separate from the operating system containing the background task. Thus, whether the device can accept phone calls, i.e., whether the telephony functionality/phone chipset 425 is enabled, does not affect the monitoring capabilities of the background task. Moreover, interrupt line 460 may monitor for incoming calls despite the status of telephony chipset 465. As such, the background task always monitors for incoming calls, irrespective of whether the telephony functionality is enabled.

---

incoming calls when the device is off. Under the record presented here (assuming the device is on), a different construction is warranted.

Therefore, the plain and ordinary meaning of "always active" is sufficient to describe the state of the background task.

Having resolved the parties' claim scope dispute, the Court finds that the plain and ordinary meaning of "always active" is sufficient. Therefore, no construction is necessary.

### c. "irrespective of the user's activity on said device without terminating said application"[11]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning. No construction necessary. | regardless of the user's interaction with the active application, without terminating or disrupting that application |

The central dispute among the parties is whether the prosecution history indicates that "without terminating said application" means "without terminating or disrupting said application." RESPONSE AT 23. Defendants propose that the applicants' remarks during prosecution show that terminating an application includes disrupting an application. *See id.*

In distinguishing U.S. Patent No. 6,529,742 ("Yang"), the applicant stated:

- Embodiments of the claimed invention are directed towards a method and system for automatically delivering a phone call to a device including "notifying a user of said device of said incoming phone call by said background task irrespective of the user's activity on said device without terminating said application." In particular, embodiments of the present invention are directed towards notifying a user without disrupting the application running on the operating system. RESPONSE TO OFFICE ACTION AT 10-11, U.S. PATENT APPL. SER. NO. 09/687,518 (AUG. 4, 2003), EX.11, ATTACHED TO RESPONSE;

- Embodiments of the claimed invention are directed towards a method and system for automatically delivering a phone call to a device including "notifying a user of said device of said incoming phone call by said background task irrespective of the user's activity on said device <u>without terminating said application</u>." In particular, embodiments of the present invention are directed towards notifying a user without disrupting the application that the user is interacting with and that is running on the operating system. An aspect of the claimed embodiment,

---

[11] This term is contained in Claim 1.

therefore, is to inform, without interruption, which is vastly different from the cited art. RESPONSE TO OFFICE ACTION AT 10-11 (emphasis in original), U.S. PATENT APPL. SER. NO. 09/687,518 (JAN. 26, 2004), EX.12, ATTACHED TO RESPONSE;

Defendants contend that these statements support their proposed construction and show that on two separate occasions, the applicants considered the act of terminating applications to include interrupting or disrupting applications. RESPONSE AT 23.

The Court finds that the prosecution history does not clearly indicate that that the applicants equated termination to disruption. It is true that in distinguishing the Yang reference, the applicant discussed "notifying a user without disrupting the application," but in the same response, the applicant also stated that "the telephony task does not terminate the application." AMENDMENT AND RESPONSE TO OFFICE ACTION AT 11-12, U.S. PATENT APPL. SER. NO. 09/687,518 (AUG. 4, 2003) ("As described in the present application, an incoming phone call may be delivered to a user without terminating other applications running on the same operating system."); *see also* RESPONSE TO OFFICE ACTION AT 4-5, U.S. PATENT APPL. SER. NO. 09/687,518 (JULY 4, 2004).[12] Moreover, the applicants characterized Yang as turning off the TV mode when receiving an incoming call: "Specifically, if an incoming phone call is received, 'MSP 30 turns off the TV unit 18 and the TV audio signal processor 38 by deactivating power control signal PW' . . . . Therefore, the TV mode is terminated upon the receipt of an incoming phone call." AMENDMENT AND RESPONSE TO OFFICE ACTION AT 12, U.S. PATENT APPL. SER. NO. 09/687,518 (AUG. 4, 2003). Even though the applicants stated that notifications could be made without disrupting the application, the applicants also described the prior art as completely terminating an application. Thus, it appears that the Examiner allowed the patent application because the invention disclosed within the '275 patent application did not terminate other applications upon

---

[12] The applicant essentially made the same comments in both the August 4, 2003 Response to Office Action and July 2004 Response to Office Action.

receipt of an incoming phone call, as opposed to simply disrupting them.  Moreover, the portions of the prosecution history to which Defendants cite do not clearly indicate an intent to redefine "terminating" to include "disrupting."

In addition, the '275 patent specification describes an embodiment where the GUI may display incoming call information, thereby interrupting the application in use with caller identification information or digitized buttons.  *See* '275 patent at 6:66-7:1.  As SmartPhone points out, the disclosure describes an embodiment where the GUI is notified and updated even when the GUI is not busy or busy but not blocked.  *See* '275 patent at 6:44-61; Figs. 5 & 6. Thus, there is a possibility of disrupting the application without terminating it.  Consequently, adopting Defendants' construction would read out an embodiment described in the specification. *See Vitronics Corp.*, 90 F.3d at 1583.

Having resolved the issue of prosecution disclaimer, the Court sees no dispute with regard to claim scope.  Therefore, no construction is necessary for the term "irrespective of the user's activity on said device without terminating said application."  *See O2 Micro*, 521 F.3d at 1362.

### III.   The '064 Patent

The '064 patent discloses "[a] computer system that attempts to establish an alternative network link upon failing to establish a requested network link."  '064 patent, ABSTRACT. Instead of providing an error message when the computer system cannot access numerous networks, particularly wireless networks, "the computer system determines whether the user has designated an alternative network link."  *Id.*  "If an alternative network link has been designated, the computer system attempts to establish the alternative network link."  *Id.*

#### a.   "network link"[13]

---

[13] This term is contained in Claim 17.

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| specific network connection the electronic system is configured to support | a specific network connection, but excluding non-network point-to-point links and link interfaces |

The parties agree that a "network link" is a "specific network connection." PLTFF'S BRIEF AT 20; RESPONSE AT 27. However, the parties dispute whether "network link" excludes "non-network point-to-point links and [non-network] link interfaces." RESPONSE AT 27. Defendants argue that the prosecution history reflects a distinction between non-network and network point-to-point links and link interfaces, and further, the patentee explicitly disclaimed non-network links. *See id.* at 27-29. SmartPhone asserts that the patentee did not forfeit claim scope during prosecution, and further, that the claim language supports the idea that a network link is a specific network connection the electronic system is configured to support. PLTFF'S BRIEF AT 20-21.

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g*, 334 F.3d at 1323 (internal citations omitted). However, prosecution disclaimer may not apply after looking at the prosecution history as a whole, which may indicate that the purported disclaimer was merely an isolated statement, lending ambiguity to whether the patent applicant clearly disavowed the particular subject matter. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (citing *Elbex Video, Ltd. v. Sensormatic Elec. Corp.*, 508 F.3d 1366, 1372-73 (Fed. Cir. 2007)).

The prosecution history reflects disclaimer of non-network point-to-point links and non-network link interfaces. After examining the record as a whole, one of ordinary skill in the art would conclude that the applicants distinguished point-to-point links and link interfaces within a

network from those void of a network. During prosecution, the Examiner rejected the '064 patent application as anticipated by U.S. Patent No. 6,681,252 ("Schuster"). REMARKS AT 2, U.S. PATENT APPL. SER. NO. 09/847,720 (APRIL 28, 2006), EX. 16, ATTACHED TO RESPONSE. In response to the Examiner's remarks regarding Schuster, and in particular, link interfaces, the applicants stated, in relevant part:

> Applicants submit that the above-cited portion of Schuster discloses alternative link interfaces. However, claim 1 requires associating one or more network link designations with one or more of the network links. Applicants submit that a link interface is not equivalent to a network link. A link interface defines how a device is connected via a link. For example, in Fig. 3 of Schuster, three link interfaces are shown that can be used to link the data network telephone with a PID. In Schuster, a PID may be linked with a data network telephone via an RS-232 link interface, an infrared link interface of a radio frequency link interface. However, the link between a data network telephone and a PID, as disclosed by Schuster, is not a network link. *No network exists between the PID and the data network telephone to which it is linked.*

*Id.* at 3-4 (emphasis added). This particular portion of the applicants' response makes a distinction between a link interface connecting a device to a PID without the use of a network, e.g., the link interface described in Schuster, and a link interface used in a system with a network. Because the applicants contrast the use of network link interfaces with non-network link interfaces, the Court finds that the applicants forfeited claim scope regarding non-network link interfaces.

Similarly, the applicants distinguished non-network point-to-point links with network point-to-point links:

> Thus, Schuster discloses that the link between a PID and its respective network data phone is a point-to-point link and that each and that each link may be a wireless link, and infrared link, or a radio frequency link. However, the point-to-point link is not a network link. The link is simply a connection between two devices without necessarily involving a network.

*Id.* at 5.    In stating that "the point-to-point link is not a network link," the applicants distinguished the type of link disclosed in Schuster, i.e. a non-network point-to-point link, with the type of link claimed in the application, particularly a point-to-point link connected to a network.

Having examined the prosecution history, the Court finds that the applicants surrendered claim scope regarding non-network point-to-point links and non-network link interfaces. Accordingly, a "network link" is "a specific network connection, but excluding non-network point-to-point links and non-network link interfaces."

## CONCLUSION

For the foregoing reasons, the court adopts the constructions set forth above.

**So ORDERED and SIGNED this 29th day of August, 2013.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE